UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

_____
                                                    )
SECURITIES AND EXCHANGE COMMISSION,   )
                                                    )
                            Plaintiff,              )
                                                    )
            v.                                      )   Civil Action No. CO 2 - 01467
                                                    )
                                                    )
DALE PETERSON,                                      )
RUSSELL KINSCH,                                     )
JAMES WALSH,                                        )
RICHARD NABOZNY,                                    )
MICHAEL SMITH,                                      )
CHARLES BALENTINE and                               )
WAYNE ARMSTRONG,                                    )
                                                    )
                            Defendants.             )
_____  )

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Dale Peterson, Russell Kinsch, James Walsh, Richard Nabozny, Michael

Smith, Charles Balentine and Wayne Armstrong:

## SUMMARY

1.      This enforcement action involves material overstatements of income by Signal

Technology Corporation ("Signal Tech"), a publicly-traded defense contractor then located in

Sunnyvale, California.  Between July 1996 and June 1998, Signal Tech's Keltec division

engaged in numerous improper accounting practices, including failing to record losses on major

contracts, prematurely recognizing revenue, and failing to write off worthless inventory. Keltec's misstated financial results rendered Signal Tech's annual and quarterly public filings materially misleading. On November 4, 1998, under new management, Signal Tech restated its financial results for 1996, 1997 and the first quarter of 1998. According to the restatement, the improper accounting at Keltec had caused Signal Tech to overstate its 1996 net income by 32%, to report a small gain in 1997 instead of a much larger loss, and to overstate its quarterly net income by between 8% and 250%.

2.     This action presents a classic example of how excessive management pressure to report higher earnings can lead to improper accounting. The defendants are former members of senior management at Signal Tech or its Keltec division. Peterson was Signal Tech's chairman and CEO. Kinsch was Signal Tech's CFO. Walsh was Signal Tech's president and also served as *de facto* president of Keltec. Smith, Armstrong and Nabozny successively served as Keltec's president. Balentine was Keltec's controller. As set forth below, each defendant personally directed or otherwise participated in the improper accounting practices. Indeed, several defendants displayed a shocking disregard for the importance of proper accounting. For example, Peterson once remarked, "I'm so sick of people hiding behind GAAP [generally accepted accounting principles] and thinking GAAP is important." Similarly, Nabozny told a member of Keltec's accounting staff, "Don't give me GAAP, I'll shove GAAP right up your [expletive deleted]. This is my [expletive deleted] company and I'll treat it how I want."

3.     Through the activities alleged in this Complaint, the defendants violated numerous provisions of the federal securities laws. Six defendants (Peterson, Kinsch, Walsh, Nabozny, Smith and Balentine) engaged in fraud in the offer or sale of securities, in violation of

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.  Two defendants (Peterson and Kinsch) made material misrepresentations to Signal Tech's auditors, in violation of Exchange Act Rule 13b2-2.  All seven defendants circumvented Signal Tech's system of internal accounting controls and falsified its books and records or caused them to be falsified, in violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 thereunder.  In addition, all seven defendants aided and abetted Signal Tech's violations of: (i) the anti-fraud provisions in Section 10(b) of the Exchange Act and Rule 10b-5; (ii) its reporting obligations under Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13 thereunder; (iii) its obligation to maintain accurate books and records under Section 13(b)(2)(A) of the Exchange Act; and (iv) its obligation to maintain a system of internal accounting controls under Section 13(b)(2)(B) of the Exchange Act.

4.      Accordingly, the Commission seeks:  (i) entry of a permanent injunction prohibiting the defendants from further violations of the relevant provisions of the federal securities laws; (ii) the imposition of a civil monetary penalty against each defendant due to the egregious nature of their violations; and (iii) entry of an order barring Peterson, Kinsch, Walsh, Nabozny and Smith from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

5.      The Commission seeks a permanent injunction pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].  The

Commission seeks an officer and director bar pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)].

6.      This Court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u and 78aa].  Venue is proper in this District because, at all relevant times, Signal Tech's corporate headquarters was in this District, many of the acts and practices alleged in this Complaint occurred in this District, and several defendants live in this District.

7.      In connection with the conduct described in this Complaint, defendants directly and indirectly made use of the mails or the means or instruments of transportation or communication in interstate commerce.

## DEFENDANTS AND RELEVANT ENTITY

8.      **Signal Tech** is a Delaware corporation that maintained its corporate headquarters in Sunnyvale, California until August 1998, when the headquarters was moved to Massachusetts. Signal Tech has six divisions, including Keltec, which design and manufacture electronic systems used in the defense, space and wireless communications industries.  Signal Tech's annual sales were more than $102 million in 1996 and more than $114 million in 1997.  Since 1993, Signal Tech's common stock has been registered with the Commission pursuant to Section 12(b) of the Exchange Act [15 U.S.C. §78l(b)] and has been traded on the American Stock Exchange.  Pursuant to Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 13a-1 and 13a-13 thereunder [17 C.F.R. §§240.13a-1 and 240.13a-13], Signal Tech was required to file with the Commission annual reports on Form 10-K and quarterly reports on Form 10-Q.

Pursuant to Regulation S-X [17 C.F.R. §210.1-01 *et seq.*], Signal Tech's annual and quarterly reports were required to contain audited financial statements prepared in conformity with GAAP.

9.    **Peterson**, age 66, lives in Saratoga, California.  He was Signal Tech's CEO from April 1994 to June 1998, and chairman of its board of directors from April 1994 to August 1998, when Signal Tech requested his resignation.  He is currently a director of a public company based in San Jose, California, but he is otherwise retired.

10.    **Kinsch**, age 52, lives in Saratoga, California.  He was CFO of Signal Tech from February 1996 to June 1997.  He is currently CFO of a private company based in Santa Clara, California.

11.    **Walsh**, age 68, lives in Sunnyvale, California.  He was Signal Tech's president from May 1993 to August 1997, its vice chairman and chief technical officer from August 1997 to December 1997, a director from May 1993 to December 1997, and a paid consultant from December 1997 to May 1998.  He also acted as Keltec's *de facto* president from July to November 1997.  He is currently president of a Fremont, California-based subsidiary of a public company.

12.    **Nabozny**, age 68, lives in Panama City Beach, Florida.  He was an executive and employee of Signal Tech for 20 years.  He became vice president of operations in 1992 and generally served as a corporate troubleshooter at the direction of Peterson.  Beginning in March or April 1997, Nabozny worked full time at Keltec and began functioning as Keltec's *de facto* president in November 1997.  He officially became Keltec's president in January 1998 and held that position until July 1998, when Signal Tech requested his resignation.  He is currently retired.

13.    **Smith**, age 53, lives in Chelmsford, Massachusetts.  He was vice-president of marketing for Signal Tech from February 1995 to October 1998.  He was also Keltec's president from February 1996 to March 1997.  He is currently president of a private company based in Pennsylvania.

14.    **Balentine**, age 54, lives in McElhattan, Pennsylvania.  He was Keltec's controller from February 1996 to March 1998, when Nabozny fired him.  He is currently manager of cost accounting for a private company in Pennsylvania.

15.    **Armstrong**, age 55, lives in Navarre, Florida.  He was Keltec's president from March 1997 to January 1998, when Peterson requested his resignation.  He is currently retired.

## STATEMENT OF FACTS

**Management Pressure to Report Higher Profits**

16.    As Signal Tech's CEO and chairman, Peterson was an aggressive manager who demanded that Signal Tech's six divisions generate increasing profits every year.  In late 1995, he fired Keltec's president and its controller.  Over the next thirty months, he installed four successive presidents at Keltec and, as set forth below, approved a variety of improper accounting practices as he continued to demand that Keltec report higher profits.

17.    In February 1996, Peterson named Smith, who was then Signal Tech's vice president of marketing, as Keltec's president.  Smith's mission, as specified by Peterson, was to stabilize Keltec and produce "double digit profits."  Indeed, the ambitious 1996 business plan called for Keltec to generate $2.7 million in pre-tax profits – twice the 1995 figure.

**Improper Accounting in 1996**

18.     Most of Keltec's business was with the United States government, generally as a subcontractor designing and manufacturing complex electronic systems for a prime contractor. Most of the contracts took months or even years to complete.  Virtually all of the contracts were at fixed prices, which meant that Keltec bore the risk that its cost to complete the contract might ultimately exceed the fixed contract price.

19.     After Smith became president in February 1996, he quickly learned that Keltec suffered from significant engineering and manufacturing problems and that Keltec's profits were shrinking or even disappearing on many important contracts.  Shortly thereafter, he began to approve several different kinds of improper accounting practices, including the failure to record contract cost increases, the premature recognition of revenue, and the failure to write off worthless inventory.

**Failure to Record Contract Costs**

20.     Under GAAP, including Statement of Position No. 81-1 ("SOP 81-1") entitled "Accounting for Performance of Construction-Type and Certain Production-Type Contracts", Statement of Financial Accounting Standards No. 5 ("FAS 5") entitled "Accounting for Contingencies", and Accounting Research Bulletin No. 45 ("ARB 45") entitled "Long-Term Construction-Type Contracts", as well as Signal Tech's own internal accounting policies, Keltec was required to determine the estimated profit or loss on each contract at the end of each reporting period and to make adjustments on the company's books if the estimate had changed from the previous period.  For example, if the known or anticipated cost to complete a contract was found to exceed the amount to be paid under the contract, then the entire known or

anticipated loss must be recorded.  Similarly, if an estimated increase in the cost to complete a contract resulted in a smaller anticipated profit, then the reduction in profit margin must be recorded by increasing the cost of sales figure attributed to the contract.  Any such adjustment must be made in the period in which the change from prior estimates becomes evident.

21.     To facilitate the process of estimating contract costs on its major contracts, Keltec's accounting staff under Balentine's direction prepared monthly "estimate at completion" ("EAC") reports and summaries.  The EAC reports identified the current estimated profit or loss on specific contracts, identified any changes to those estimates from the previous month, and indicated whether cost of sales adjustments were needed for particular contracts.  The EAC summaries listed the cost of sales adjustments that were actually made on Keltec's books.  Read together, the EAC reports and summaries indicated whether required contract cost adjustments (as shown on the reports) had actually been recorded (as shown on the summaries).  The EAC reports and summaries were regularly circulated to Keltec's president and to Peterson and Kinsch at Signal Tech.

22.     When Smith arrived at Keltec in March 1996, he discovered that Keltec had failed to record a large amount of contract costs.  During the second quarter of 1996, Smith caused Keltec to record $2.2 million of such costs.  However, Keltec continued to experience contract cost overruns.  Indeed, by the end of the third quarter of 1996, instead of being on track to achieve its goals of $2.7 million in profits, Keltec had already accumulated a pre-tax loss of more than $1.2 million.  With Smith's approval, Keltec once again began failing to record contract cost increases.

23.     By the end of the third quarter of 1996, the unrecorded contract costs were $338,000, of which $270,000 reflected the anticipated loss on a large contract to provide helicopter power supplies for Elisra, an Israeli company.  Smith knew that the anticipated Elisra loss had not been recorded at the end of the third quarter of 1996.  He discussed the Elisra contract with Peterson, who approved the decision not to record the Elisra loss.  Kinsch and Balentine also knew that the anticipated Elisra loss had not been recorded.

24.     By the end of the fourth quarter of 1996, the unrecorded loss on the Elisra contract had increased to approximately $370,000, and Keltec had also failed to record a significant cost increase on a large contract with Raytheon.  Thus, as of December 31, 1996, Keltec had failed to record approximately $451,000 of contract cost increases.  Peterson, Kinsch, Smith and Balentine were all aware of the continuing failure to record the Elisra contract costs.

**Premature Revenue Recognition**

25.     Under GAAP, including Statement of Financial Accounting Concepts No. 5 ("CON 5") entitled "Recognition and Measurement in Financial Statements of Business Enterprises", revenue must be recognized when it is earned and is realized or realizable.  Revenue is "earned" when the entity has substantially done whatever it must do to be entitled to payment.  Revenue is "realized" when goods or services are exchanged for cash or claims to cash.  Revenue is "realizable" when related assets received or held are readily convertible to known amounts of cash or claims to cash.  Under SEC Accounting and Auditing Enforcement Release No. 108 (August 5, 1986), revenue may sometimes be recognized before delivery of the finished goods, but only when the buyer asks the seller to hold the goods and when the

9

transaction meets other specified criteria.  Signal Tech's internal accounting policy was consistent with these requirements of GAAP.

26.    While he was president of Keltec, Smith personally approved all so-called "ship-in-place" transactions in which revenue was recognized before the finished goods were shipped to the buyer.  In many instances, the recognition of revenue on these transactions was premature because the requirements of GAAP and Signal Tech's internal accounting policy had not been satisfied.  For example, Smith directed that $126,000 of revenue be recognized on one such transaction even though Keltec, not the customer, had requested ship-in-place treatment.

27.    Smith also approved the recognition of revenue for advance payments received from customers to cover certain development expenses, even though Kinsch had informed him that recognizing revenue on such advance payments did not comply with GAAP.  For example, in the second and third quarters of 1996, Smith told Keltec's accounting department to record $683,000 as payments for "non-recurring engineering services" to customers, even though the payments had actually been advance payments for development expenses.  Balentine implemented Smith's directives to recognize this revenue without determining whether doing so complied with GAAP.

28.    During the second quarter of 1996, Smith and Balentine caused Keltec to recognize approximately $934,000 of revenue on "ship-in-place" transactions and advance payments that did not comply with GAAP or Signal Tech's internal accounting policy.  They continued this practice during the rest of 1996, causing Keltec to recognize $639,000 of improper revenue in the third quarter and $491,000 of improper revenue in the fourth quarter.

**Failure to Write Off Excess Inventory**

29.    Under GAAP, including Accounting Research Bulletin No. 43 ("ARB 43")
entitled "Inventory Pricing", inventory consists of raw materials, labor and overhead associated
with the production process.  Inventory should ordinarily be recorded at cost, and a company
should recognize a loss when the current market value of its inventory is found to be less than the
cost to produce the inventory.  In other words, if a company cannot use all of its inventory for a
contract and cannot transfer the excess inventory to another contract, then it must write off the
worthless inventory record the loss in the current period.

30.    By the fourth quarter of 1996, Keltec had accumulated $476,000 of excess
inventory, denominated "work in process" or "WIP", on many smaller contracts.  Balentine,
however, did not write off the excess WIP.  Indeed, he had no regular practice of even comparing
Keltec's WIP against its backlog.  As a result, the $476,000 in excess WIP remained on Keltec's
books, thereby understating its cost of sales and overstating its profits.

**The 1996 Audit**

31.    Signal Tech's outside auditors discussed Keltec's contract losses with Smith and
Balentine during the 1996 audit.  Smith refused to follow the auditors' recommendation to
recognize the $370,000 unrecorded loss on the Elisra contract.  Smith claimed that the contract
was going to become more profitable, but under GAAP, the possibility that a contract may prove
more profitable in the future is no basis for deferring the recognition of a currently anticipated
contract loss.  Kinsch also refused to follow the auditors' recommendation.  Instead, he created a
$200,000 reserve for the Elisra contract even though, under GAAP, the reserve should have

covered the full $370,000 anticipated loss.  Peterson approved Kinsch's decision to create the inadequate $200,000 reserve.

32.     On January 27, 1997, Peterson and Kinsch provided the auditors with a management representation letter falsely stating that adequate reserves had been made for potential losses on certain specified contracts (including Elisra) and for foreseeable increases in WIP.  The letter also stated that Signal Tech's financial statements were fairly presented in conformity with GAAP.  Peterson and Kinsch signed the letter even though they knew that Keltec had failed to record losses on several contracts (including Elisra), and even though they knew or should have known that Signal Tech had no reserves for excess WIP.

33.     In February 1997, the auditors discussed with Peterson, Kinsch, Smith and Balentine the fact that Keltec had improperly recognized revenue on ship-in-place transactions and advance payments.  None of them took any effective action to correct the improper revenue recognition.

34.     By late March 1997, when Signal Tech's 1996 annual report on Form 10-K was ready to be filed, the unrecorded loss on the Elisra contract had grown to over $600,000. Contrary to GAAP, Kinsch did not increase Signal Tech's reserves to reflect the larger anticipated loss.  Instead, the reserve was actually reduced by $210,000.  No one at Signal Tech informed the auditors of the increased contract loss or the reduced reserve.  In fact, Peterson and Kinsch sent the auditors a letter dated March 28, 1997 falsely stating that the representations in their prior letter were still accurate.

**Impact on Signal Tech's 1996 Financial Results**

35.     The improper accounting practices described above caused Keltec to understate its cost of sales and to overstate its 1996 pre-tax profits by $1,190,000.  Smith and Balentine forwarded Keltec's misstated financial results to Signal Tech for consolidation with the results from its other divisions.

36.     Signal Tech's consolidated financial results for 1996, including its results for each quarter, were included in its annual report to the Commission on Form 10-K.  The Form 10-K was signed by Peterson and Kinsch and filed on March 31, 1997.  Signal Tech also announced its 1996 financial results in press releases.

37.     According to the restated financial results released in November 1998, the improper accounting practices at Keltec caused Signal Tech's consolidated financial statements for 1996, which were included in the Form 10-K, to be materially misstated.  For the third quarter, Signal Tech overstated its net income by 64% – $995,000 instead of $608,000.  For the fourth quarter, Signal Tech overstated its net income by 131% – $1,235,000 instead of $435,000. For the year, Signal Tech overstated its net income by 32% – $2,245,000 instead of $1,698,000.

**Improper Accounting in 1997**

**First Quarter 1997**

38.     Smith remained as Keltec's president until the end of the first quarter of 1997, when he returned to his position as Signal Tech's vice president of marketing.  Despite the fact that he had not been able to meet the profit goals for 1996, he committed Keltec to an ambitious 1997 business plan that projected more than $3 million in pre-tax profits.  The improper

accounting practices at Keltec discussed above all continued during Smith's final quarter as Keltec's president.

39.     By March 31, 1997, the total of unrecorded contract costs had grown to more than $1 million, including $618,500 on the Elisra contract and $300,000 on two Raytheon contracts.

40.     During the first quarter of 1997, Keltec prematurely recognized revenue on nine different contracts totaling more than $915,000.  In one instance, Smith personally directed that $53,000 be recognized on a ship-in-place transaction that Keltec, not the customer, had requested.

41.     During the first quarter of 1997, Keltec failed to write off $69,000 of excess WIP on certain contracts, including contracts for which performance had been completed.  Under GAAP, any excess WIP on a completed contract should be written off immediately, but Balentine improperly amortized the inventory write-down over several financial reporting periods.  He continued the improper amortization of excess WIP on certain completed contracts in later quarters as well.

**Second Quarter 1997**

42.     On March 31, 1997, Peterson hired Armstrong to replace Smith as Keltec's president.  Almost immediately, however, Peterson became dissatisfied with Armstrong's performance and dispatched Walsh and Nabozny to Keltec.  Ostensibly, Walsh was sent to stop large cost overruns due to Keltec's engineering problems, and Nabozny was sent to address problems in the materials department.

43.     Armstrong received the EAC reports and summaries and participated in discussions about whether to make contract cost adjustments.  He knew that Balentine was not making the required adjustments, but he nevertheless approved Keltec's monthly financial results.

44.     Kinsch resigned as Signal Tech's CFO in June 1997.  Peterson did not replace him.  Instead, Peterson began functioning as *de facto* CFO, making decisions about accounting policy and signing the quarterly Forms 10-Q.

45.     Walsh began functioning as *de facto* president of Keltec in July 1997 and participated in the process of closing Keltec's books for the second quarter of 1997.  At that point, Keltec had spent more on the Elisra project than the entire contract price, meaning that the loss on the contract had become actual, not just anticipated.  Nevertheless, Walsh directed that the loss not be recorded in the second quarter of 1997.  He also directed that no adjustment be made on Keltec's large contract with Lockheed for its Tomahawk program, even though the anticipated loss on that contract was $113,000.  Peterson approved Walsh's improper direction not to record losses on these two contracts.

46.     Other improper accounting practices at Keltec continued during the second quarter of 1997.  For example, Keltec improperly recognized $149,000 of revenue and failed to write off $619,000 of excess WIP.

**Third Quarter 1997**

47.     During the third quarter of 1997, Walsh caused Keltec to employ an additional improper accounting practice.  Besides the failure to record known or anticipated losses on some

16

contracts, Keltec's accounting staff began amortizing known losses on other contracts over multiple reporting periods instead of recognizing them in the quarter in which the losses became known, as required by SOP 81-1.  Peterson approved the amortization, while Armstrong questioned the practice but made only an ineffectual effort to alert Signal Tech management.  Balentine believed the practice was improper, but expressed his concerns to no one.

48.     In September 1997, Balentine provided Walsh with a list showing that Keltec had approximately $1.5 million of increased contract costs for the quarter.  Walsh then prepared his own list, which falsely indicated that Keltec needed to record only $500,000 of those costs.  To reach that figure, Walsh improperly eliminated $1 million of known costs by combining unprofitable contracts with profitable contracts, failing to book cost increases that he deemed to be immaterial, and classifying other contracts as "under review."  Under GAAP, none of these three purported justifications was a valid basis for not recording known cost increases.  Balentine followed Walsh's list and recorded only $500,000 of contract losses, even though he expressed concern to Walsh and others that doing so might not comply with GAAP.  Armstrong allowed Balentine to follow Walsh's list, even though he was aware of Balentine's concerns.

49.     Other improper accounting practices at Keltec continued during the third quarter of 1997.  For example, Keltec improperly recognized $471,000 of revenue and failed to write off $321,000 of excess WIP.

**Fourth Quarter 1997**

50.     In mid-November 1997, Walsh announced that he intended to leave Signal Tech to form his own company.  At that time, Nabozny replaced Walsh as *de facto* president of Keltec,

although Armstrong still held the title. Nabozny almost immediately directed Balentine not to make any contract cost adjustments on Keltec's books until the contracts were actually completed. Balentine objected that doing so would violate GAAP. Nabozny backed off at the time but, as discussed below, he later caused Keltec's accounting staff to suspend the EAC process that was used to identify appropriate contract cost adjustments.

51.     On January 9, 1998, Peterson held a telephone conference call with Nabozny, Walsh, Armstrong and Balentine to discuss Keltec's fourth quarter 1997 results. At that point, both Keltec and Signal Tech had reported net losses for the second and third quarters of 1997, and it appeared likely that both would report a net loss for the fourth quarter as well. During the call, Peterson directed several improper adjustments to Keltec's general ledger to reduce the division's losses. These included: (i) the reversal of a $159,000 write-off on a large Raytheon contract, which had the effect of concealing a probable loss; (ii) the failure to record $246,000 in contract cost adjustments; and (iii) a $100,000 reduction in Keltec's reserve for excess and obsolete inventory. The overall effect of these changes was to reduce Keltec's reported fourth quarter loss by more than $500,000.

52.     Other improper accounting practices continued during the fourth quarter of 1997. For example, Keltec improperly recognized $231,000 of revenue and failed to write off $180,000 of excess WIP.

**The 1997 Audit**

53.     On January 28, 1998, Peterson provided the auditors with a management representation letter falsely stating that adequate reserves had been made for potential losses on

the company's contracts and for foreseeable increases in WIP. The letter also stated that Signal Tech's financial statements were fairly presented in conformity with GAAP. Peterson signed the letter even though, during the January 9, 1998 conference call less than three weeks earlier, he had personally directed improper adjustments to Keltec's contract costs and excess WIP that reduced Keltec's fourth quarter 1997 loss by more than $500,000.

54.    On March 27, 1998, Peterson sent a second letter to the auditors falsely stating that the representations in his prior letter were still accurate.

### Impact on Signal Tech's 1997 Financial Results

55.    The improper accounting practices described above caused Keltec to understate its cost of sales and to overstate its 1997 pre-tax profits by $1.3 million. As in 1996, Keltec's misstated financial results were forwarded to Signal Tech for consolidation with the results from its other divisions.

56.    Signal Tech's consolidated results for 1997 were included in its quarterly reports on Form 10-Q for the first quarter (filed on May 2, 1997), for the second quarter (filed on August 14, 1997), and for the third quarter (filed on November 14, 1997), and on its annual report on Form 10-K (filed on March 30, 1998). Kinsch signed the first quarter Form 10-Q; Peterson signed all of the other filings.

57.    According to the restated financial results released in November 1998, the improper accounting practices at Keltec caused Signal Tech's consolidated financial statements for 1997 to be materially misstated. For the first quarter, Signal Tech overstated its net income by 253% – $745,000 instead of $211,000. For the second quarter, Signal Tech understated its net

loss by 74% – $107,000 instead of $419,000.  For the third quarter, Signal Tech understated its net loss by 67% – $320,000 instead of $983,000.  For the year 1997, Signal Tech reported a net profit of $338,000 when it should have reported a pre-tax net loss of $657,000.

**Improper Accounting in 1998**

### First Quarter 1998

58.     In January 1998, Peterson fired Armstrong and named Nabozny as president of Keltec.  Nabozny promptly presented an aggressive business plan calling for Keltec to generate a $1 million profit in 1998 (even though it had reported a $3.3 million loss in 1997 – a loss that was actually understated by $1.3 million due to the improper accounting).

59.     In January 1998, Nabozny caused Keltec's accounting staff to stop preparing the EAC reports and summaries that had been used to identify contract cost adjustments.  Instead, Nabozny personally dictated the cost figures to be recorded on contracts each month, and Keltec's accounting staff made the corresponding entries, even though Nabozny's figures had no apparent basis.

60.     In March 1998, Nabozny fired Balentine.  He then closed Keltec's books for the first quarter of 1998 by preparing a handwritten list of improper adjustments and directing the accounting staff to enter them directly on Keltec's general ledger.  These included a $121,000 reduction in the reserve for warranty liability and a $61,000 decrease in the cost of sales.

### Impact on Signal Tech's 1998 Financial Results

61.     The improper accounting practices described above caused Keltec to understate its cost of sales and to overstate its pre-tax net profits for the first quarter of 1998.  Keltec's

misstated financial results were forwarded to Signal Tech for consolidation, and Signal Tech's

consolidated results were included in its Form 10-Q for the first quarter of 1998, which was

signed by Peterson and filed on May 15, 1998.

62.     According to the restated financial results released in November 1998, the

improper accounting practices at Keltec caused Signal Tech's consolidated financial statements

for the first quarter of 1998 to overstate its net income by 82% – $370,000 instead of $203,000.

**Discovery of the Improper Accounting**

63.     In April 1998, Nabozny hired James Kampfer, a certified public accountant, as

Keltec's controller.  Shortly after Kampfer took over, Balentine's former assistant told him that

Keltec might have millions of dollars of unrecorded losses.  Over the next few weeks, Kampfer

uncovered evidence of the improper accounting practices described above.

64.     On June 1, 1998, George Lombard became Signal Tech's CEO.  Peterson had

stepped down as CEO, but he remained chairman of Signal Tech's board of directors.

65.     On June 4, 1998, Kampfer wrote a memorandum to Nabozny reporting on his

investigation of Keltec's improper accounting.  Nabozny dismissed Kampfer's conclusions,

claiming that Kampfer had not been with the company long enough to understand the financial

situation at Keltec and even threatening to fire Kampfer.  When Nabozny refused to address

Kampfer's concerns, Kampfer contacted Lombard.

66.     On July 2, 1998, Lombard visited Keltec for a divisional review meeting.  When

Kampfer began to discuss the unrecorded contract losses, Nabozny ordered him to stop.

Lombard then halted the meeting and fired Nabozny.  That evening, Lombard wrote a

memorandum to Peterson describing $3.2 million in unrecorded losses at Keltec.  Peterson

demanded that Lombard retract the memorandum.  When Lombard refused, Peterson threatened

to fire him.  However, Lombard obtained support from Signal Tech's board of directors for an

internal audit of Keltec.

67.     The internal audit revealed $9.8 million of adjustments that were necessary to

correct the improper accounting at Keltec.  At a meeting on August 4, 1998, Lombard presented

the results to the outside auditors and several members of the board of directors.  Peterson

disputed Lombard's findings, but the board members asked for and obtained Peterson's

resignation.  The board then authorized the auditors to conduct a re-audit for 1997.

**The Restatement of Signal Tech's Financial Results**

68.     On August 17, 1998, Signal Tech announced that it would report at least

$9 million in pre-tax charges against earnings for the first and second quarters of 1998 and that it

expected to restate its results for prior periods.  During the next two months, PWC assisted the

company's preparation of restated financial statements.

69.     On November 4, 1998, Signal Tech filed an amended Form 10-K for 1997 that

restated its quarterly and yearly financial results for 1996 and 1997.  It also filed an amended

Form 10-Q that restated its financial results for the first quarter of 1998.

70.     In these filings, Signal Tech took charges against income for the period from

January 1, 1996 through June 30, 1998 totaling approximately $11 million, of which $9 million

related to fraudulent accounting at Keltec.  As a result of the restatement, Signal Tech reduced its

1996 net income from $3.7 million to $2.9 million, converted its 1997 net income of $718,000

into a $1 million net loss, and reduced its net income for the first quarter of 1998 from $630,000 to $338,000.

### FIRST CLAIM FOR RELIEF
#### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 by Peterson, Kinsch, Walsh, Nabozny, Smith and Balentine)

71.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-70 of the Complaint as if set forth fully herein.

72.     As set forth above, Peterson signed Signal Tech's materially misleading Forms 10-K for 1996 and 1997 and materially misleading Forms 10-Q for the second quarter of 1997 through the first quarter of 1998.  He knew or was reckless in not knowing that these filings were materially misleading because, among other things, they incorporated financial results for Keltec that failed to record contract cost increases and improperly recognized revenue from ship-in-place transactions and advance payments, and because he himself had directed more than $500,000 of improper adjustments to Keltec's fourth quarter 1997 results during the January 9, 1998 conference call.  He tried to conceal the improper accounting by, among other things, signing false management representation letters to Signal Tech's auditors and threatening to fire Signal Tech's new CEO if he did not retract a report about the unrecorded losses on Keltec's books.  His lack of concern for proper accounting is evident from his sworn investigative testimony before the Commission staff, in which he stated, "I'm so sick of people hiding behind GAAP and thinking GAAP is important."

73.     As set forth above, Kinsch signed Signal Tech's materially misleading Form 10-K for 1996 and materially misleading Form 10-Q for the first quarter of 1997.  He knew or was

reckless in not knowing that these filings were materially misleading because, among other things, they incorporated financial results for Keltec that failed to record contract cost increases and improperly recognized revenues from ship-in-place transactions and advance payments. He tried to conceal the improper accounting by, among other things, signing false management representation letters to Signal Tech's auditors.

74.    As set forth above, Walsh substantially participated in Signal Tech's filing of materially misleading Forms 10-Q for the second and third quarters of 1997 and a materially misleading Form 10-K for 1997 incorporating the quarterly results. For example, he directed the failure to record contract cost increases and the amortization of known contract losses over multiple periods. In so doing, he ignored Balentine's warning that his directives would result in inaccurate accounting. He knew or was reckless in not knowing that Keltec's misstated financial results would render Signal Tech's public filings materially misleading.

75.    As set forth above, Nabozny substantially participated in Signal Tech's filing of a materially misleading Form 10-K for 1997 and a materially misleading Form 10-Q for the first quarter of 1998. For example, he directed the failure to record contract cost increases, halted the preparation of the EAC reports designed to identify appropriate contract cost adjustments, directed unsupported reductions to Keltec's reserves, and approved the failure to write off worthless WIP. He also participated in the January 9, 1998 conference call in which Peterson directed more than $500,000 of improper adjustments to Keltec's fourth-quarter 1997 results. He tried to conceal the improper accounting by threatening to fire Keltec's new controller for reporting on Keltec's practices. His lack of concern for proper accounting is evident from his remark to a member of Keltec's accounting staff, "[D]on't give me GAAP, I'll shove GAAP

24

right up your [expletive deleted]. This is my [expletive deleted] company and I'll treat it how I want." He knew or was reckless in not knowing that Keltec's misstated financial results would render Signal Tech's public filings materially misleading.

76.     As set forth above, Smith substantially participated in Signal Tech's filing of a materially misleading Form 10-K for 1996 and materially misleading Form 10-Q for the first quarter of 1997. For example, he approved Keltec's failure to record known or anticipated contract cost increases. He also approved the premature recognition of revenue from certain advance payments, even though Kinsch warned him that recognizing revenue on advance payments was not permitted under GAAP. He knew or was reckless in not knowing that Keltec's misstated financial results would render Signal Tech's public filings materially misleading.

77.     As set forth above, Balentine substantially participated in Signal Tech's filing of materially misleading Forms 10-K for 1996 and 1997 and materially misleading Forms 10-Q for all of 1997 and the first quarter of 1998. For example, he directed the amortization of worthless WIP on certain completed contracts. He also implemented directives by Smith, Walsh and Nabozny not to record known or anticipated contract cost increases, Smith's directives to recognize revenue from ship-in-place transactions and advance customer payments, Walsh's directive to amortize known contract cost losses over multiple periods, Walsh's directive to reduce contract cost adjustments by more than $1 million, and Peterson's directive to reduce Keltec's fourth-quarter 1997 loss by more than $500,000. He knew or was reckless in not knowing that Keltec's misstated financial results would render Signal Tech's public filings materially misleading.

25

78.     By reason of the foregoing, Peterson, Kinsch, Walsh, Nabozny, Smith and Balentine, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities:  (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons, including purchasers or sellers of Signal Tech's securities.

79.     As a result, Peterson, Kinsch, Walsh, Nabozny, Smith and Balentine violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## SECOND CLAIM FOR RELIEF
### (Violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 by All Defendants)

80.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-79 of the Complaint as if set forth fully herein.

81.     As set forth above, Peterson knowingly directed others to record false entries on Keltec's books, including the entries that failed to record contract cost increases and that reduced Keltec's fourth quarter 1997 loss by more than $500,000.

26

82.     As set forth above, Kinsch knowingly directed others to record false entries on Signal Tech's and Keltec's books, including the entries that failed to record contract cost increases and that created the inadequate $200,000 reserve for the Elisra contract.

83.     As set forth above, Walsh knowingly directed others to record false entries on Keltec's books, including the entries that failed to record contract cost increases and that amortized known contract losses over multiple reporting periods.

84.     As set forth above, Nabozny knowingly directed others to record false entries on Keltec's books, including the entries that failed to record contract cost increases, that reduced the reserves for warranty liability by $121,000, that reduced the cost of sales by $61,000, and that reflected the contract cost figures he fabricated.

85.     As set forth above, Smith knowingly directed others to record false entries on Keltec's books, including the entries that failed to record contract cost increases and that prematurely recognized revenue from certain ship-in-place transactions and advance customer payments.

86.     As set forth above, Balentine knowingly amortized worthless WIP on certain completed contracts and directed others to record false entries on Keltec's books, including the entries that failed to include contract cost increases, amortized known contract losses over multiple periods, reduced contract cost adjustments by more than $1 million, improperly recognized revenue, and reduced Keltec's fourth-quarter 1997 loss by more than $500,000.

87.     As set forth above, Armstrong knowingly caused others to record false entries on Keltec's books, including the entries that failed to record contract cost increases.

27

88.     By reason of the foregoing, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong knowingly circumvented Signal Tech's system of internal accounting controls and, directly or indirectly, falsified or caused to be falsified Signal Tech's books, records and accounts.

89.     As a result, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

### THIRD CLAIM FOR RELIEF
#### (Violation of Exchange Act Rule 13b2-2
#### by Peterson and Kinsch)

90.     The Commission repeats and incorporates by reference the allegations in paragraphs 1-89 of the Complaint as if set forth fully herein.

91.     As set forth above, Peterson was Signal Tech's CEO and chairman of the board, and Kinsch was Signal Tech's CFO.  In connection with the 1996 audit, they signed a management representation letter stating that Signal Tech had adequate reserves for potential losses on certain contracts and for increases in WIP.  They sent a supplemental letter reaffirming the representations in their previous letter.  They knew or were reckless in not knowing that those representations were false.  For example, they were aware that the probable losses on the Elisra contract far exceeded the $200,000 reserve for that contract, that Keltec had improperly

recognized revenue from ship-in-place transactions and advance payments, and that Signal Tech and Keltec did not have any reserves for worthless WIP.

92.     Peterson signed the management representation letter in connection with the 1997 audit.  He also signed representation letters to the auditors in connection with Signal Tech's quarterly financial results for the second and third quarters of 1997 and the first quarter of 1998. He knew or was reckless in not knowing that these representations about the accuracy of Signal Tech's financial results were false.

93.     By reason of the foregoing, Peterson and Kinsch directly or indirectly made or caused to be made a materially false or misleading statement, or omitted to state, or caused another person to omit to state, a material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (i) an audit or examination of the financial statements of an issuer required to be made or (ii) the preparation or filing of a document or report required to be filed with the Commission.

94.     As a result, Peterson and Kinsch violated Rule 13b2-2 promulgated under the Exchange Act [17 C.F.R. §240.13b2-2], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## FOURTH CLAIM FOR RELIEF
### (Aiding and Abetting Signal Tech's Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5
### by All Defendants)

95.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-94 of the Complaint as if set forth fully herein.

96.    Signal Tech's annual reports to the Commission on Form 10-K for 1996 and 1997 and its quarterly reports to the Commission on Form 10-Q for the third quarter of 1996 through the first quarter of 1998 materially misstated the company's financial results.  As a result, Signal Tech violated Section 10(b) of the Exchange Act [15 U.S.C. §78m(a)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

97.    As set forth above, Peterson and Kinsch signed one or more of Signal Tech's materially misleading public filings, and Walsh, Nabozny, Smith and Balentine substantially participated in one or more of those public filings.

98.    In addition, Armstrong substantially participated in Signal Tech's filing of materially misleading Forms 10-Q for the second and third quarters of 1997.  He knew that Keltec's financial results for those quarters were materially misleading because of the failure to record known or anticipated contract cost increases, yet he approved Keltec's results and transmitted them to Signal Tech.

99.    By reason of the foregoing, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong provided knowing and substantial assistance to one or more of Signal Tech's materially misleading public filings, and they knew or were reckless in not knowing that Keltec's misstated financial results would render Signal Tech's public filings materially misleading.

100.    As a result, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong each aided and abetted Signal Tech's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

### FIFTH CLAIM FOR RELIEF
#### (Aiding and Abetting Signal Tech's Violations of
#### Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13
#### by All Defendants)

101.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-100 of the Complaint as if set forth fully herein.

102.    Signal Tech's annual reports to the Commission on Form 10-K for 1996 and 1997 and its quarterly reports to the Commission on Form 10-Q for the first quarter of 1997 through the first quarter of 1998 materially misstated the company's financial results.  As a result, Signal Tech violated Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1, 240.13a-13].

103.    As set forth above, Peterson and Kinsch signed one or more of Signal Tech's materially misleading filings with the Commission, and Smith, Walsh, Nabozny, Balentine and Armstrong substantially participated in one or more of those public filings.

104.    By reason of the foregoing, Peterson, Kinsch, Smith, Walsh, Nabozny, Balentine and Armstrong provided knowing and substantial assistance to Signal Tech's filing of materially misleading financial reports.

105.    As a result, Peterson, Kinsch, Smith, Walsh, Nabozny, Balentine and Armstrong each aided and abetted Signal Tech's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.

## SIXTH CLAIM FOR RELIEF
### (Aiding and Abetting Signal Tech's Violations of Section 13(b)(2)(A) of the Exchange Act by All Defendants)

106.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-105 of the Complaint as if set forth fully herein.

107.    Signal Tech maintained false and misleading books, records and accounts which, among other things, materially overstated the company's revenue and net income for 1996, 1997 and the first quarter of 1998.  As a result, Signal Tech violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)].

108.    As set forth above, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong provided knowing and substantial assistance to the improper accounting practices at Keltec.

109.    As a result, Peterson, Kinsch, Smith, Walsh, Nabozny, Balentine and Armstrong each aided and abetted Signal Tech's violations of Section 13(b)(2)(A) of the Exchange Act.

## SEVENTH CLAIM FOR RELIEF
### (Aiding and Abetting Signal Tech's Violations of Section 13(b)(2)(B) of the Exchange Act by All Defendants)

110.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-109 of the Complaint as if set forth fully herein.

111.    Signal Tech failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit

preparation of financial statements in conformity with GAAP.  As a result, Signal Tech violated Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)].

112.    As set forth above, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong failed to ensure that Keltec was properly recording contract costs, that controls were in place for recording ship-in-place transactions and advance payments, and that Keltec was evaluating its inventory and making appropriate write-offs.

113.    By reason of the foregoing, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong provided knowing and substantial assistance to the absence of a system of internal accounting controls sufficient to provide reasonable assurances that transactions at Keltec were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

114.    As a result, Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong each aided and abetted Signal Tech's violations of Section 13(b)(2)(B) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court:

A.    Enter a permanent injunction restraining Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong and each of their respective agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of:

1.    Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5;

2.      Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1];

3.      Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1 and 240.13a-13];

4.      Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)]; and

5.      Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)];

B.      Enter a permanent injunction restraining Peterson and Kinsch and each of their respective agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2];

C.      Order Peterson, Kinsch, Walsh, Nabozny, Smith, Balentine and Armstrong each to pay an appropriate civil monetary penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.      Enter an order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], barring Peterson, Kinsch, Walsh, Nabozny and Smith from serving as an officer or director of any issuer required to file reports with the Commission pursuant to Sections 12(b), 12(g) or 15(d) of the Exchange Act [15 U.S.C. §§78l(b), 78l(g) and 78o(d)];

E.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.      Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

_____

Juan Marcel Marcelino
District Administrator

Celia D. Moore (Mass. Bar No. 542136)
Deputy Assistant District Administrator

Frank C. Huntington (Mass. Bar No. 544045)
Senior Trial Counsel

Ellen E. Bober (Mass. Bar No. 567598)
Senior Enforcement Counsel

Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
73 Tremont Street, Suite 600
Boston, MA  02108
(617) 424-5900  ext. 201 (Huntington)
                    ext. 608 (Bober)
(617) 424-5940  fax

Dated:  March 26, 2002